# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# NORFOLK DIVISION

**CHRISTOPHER ANDERSON,**
    2149 Bellflower Lane
    Chesapeake Virginia 23323

                                        **Plaintiff,**

**v.**                              **Civil Action No.:**

**ALCON SURGICAL INC., aka ALCON INC.**
**Serve: WILLIAM DORAN**
      **6201 South Freeway,**
      **Fort Worth, Texas 76134-2001**

**and**

**WILLIAM DORAN, individually and in his official**
**capacity as President of Alcon Surgical Inc. aka Alcon Inc.**
**Serve:**
      **6201 South Freeway,**
      **Fort Worth, Texas 76134-2001**


**and**

**KEVIN CLARK, individually and in his official capacity**
**As Division Manager of Alcon Surgical Inc. aka Alcon Inc.**
**Serve:**
      **6201 South Freeway,**
      **Fort Worth, Texas 76134-2001**

**and**

**BERT MARTIN, individually and in his official**
**capacity as an agent of Alcon Surgical Inc. aka Alcon Inc.**
**Serve:**
      **11921 Rothbury Drive**
      **Richmond, VA 23236**

                                        **Defendants.**

# COMPLAINT

COMES NOW plaintiff, **Christopher Anderson** ("Anderson"), by counsel, and states as follows for his Complaint against defendants **Alcon Surgical Inc**. **aka Alcon Inc**. ("Alcon"), **William Doran** ("Doran") in his official capacity as President and agent of **Alcon Surgical Inc**., **aka Alcon Inc.** and **Kevin Clark** ("Clark:), individually and in his official capacity as agent of **Alcon Surgical Inc**., **aka Alcon Inc.** and **Bert Martin** ("Martin") individually and in his official capacity as an agent of **Alcon Surgical Inc**. **aka Alcon Inc.** :

## Nature of Action

1. This action is brought by Mr. Anderson to secure redress from the individual and Corporate defendants for violation of his civil right to be free from employment discrimination, retaliation and a hostile work environment on the basis of his race (African American).

2. Mr. Anderson's coworker Martin engaged in a systematic and continual pattern of behavior to harass him by using racial slurs and making inappropriate remarks based on Mr. Anderson's race.

3. In early December 2019 Mr. Anderson filed a complaint with the Human Resources department of Alcon (HR) regarding the toxic and racially abusive work environment created by Martin's behavior.

4. Following filing the complaint Mr. Anderson was contacted on December 18, 2019 by Ryan Garman of the Global Employee Relations department of Alcon. Mr. Anderson and Mr. Garman spoke 3 times about the complaint.

5. Following the conversations with Mr. Garmin Mr. Anderson did not receive a formal response to his complaint from the HR department of Alcon.

6. On January 29, 2020, Doran requested a "man to man" conversation with Anderson during a company meeting in Cancun, Mexico.

7. Doran advised Anderson that Alcon had made no decision on what if any disciplinary actions would be taken towards Martin other than a firm warning.

8. As a result of Alcon's failure to properly address Martin's toxic and racially abusive behavior, Anderson resigned from his employment with Alcon.

## Parties

9. Plaintiff Christopher Anderson is a citizen of the Commonwealth of Virginia who resides in Chesapeake, Virginia.

10. Defendant Alcon Surgical Inc. aka Alcon Inc. is a corporation with its corporate offices located in Fort Worth Texas and employs over 501 employees.

11. Defendant William Doran is a citizen of Texas and the President of Alcon Surgical Inc aka Alcon Inc.and at all times pertinent to this suit was an agent of Alcon and at all times spoke for himself and the corporation.

12. Defendant Kevin Clark is a citizen of the Commonwealth of Virginia and is the Division Manager and at all times pertinent to this suit an agent of Alcon.

13. Defendant Bert Martin is a citizen of the Commonwealth of Virginia and is employed by Alcon as an Account Manager and at all times pertinent to this suit was an agent of Alcon.

## Jurisdiction and Venue

14. This Court has subject matter jurisdiction of this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

15. Venue is proper in this district pursuant to 42 U.S.C. Section 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2) as Anderson was employed by Alcon in this District and decisions adverse to Mr. Anderson's employment that are the subject of this action were made in this judicial district.

**Factual Allegations**

16. In January 2018 Mr. Anderson, an African American male, began employment with Alcon as a Cataract Refraction Manager (CRM).

17. Bert Martin is an Account Manager (AM) with Alcon.

18. The Account Managers spend 92% of their time in the operating room assisting surgical personnel.

19. The Cataract Refraction Managers (CRM) are responsible for working with existing customers to promote products and consult with physicians, nurses, and office staff on Advanced Technology products.

20. The selling of Advanced Technology products is a multifaceted process consisting of three primary steps:

    1. Step 1. The introduction and education of the surgical device which is generally performed by the CRM with existing customers and potential new customers.

    2. Step 2. This is the use of the device and surgery. Generally, both the AM and CRM our present for the step to assist the surgeon and other operating room personnel.

    3. Step 3. This step is the integration of the device into the surgeon's current business practices via staff education and outcome management. This step is managed by the CRM.

21. This system required the CRMs to work closely with the AMs.

22. When Anderson began working at Alcon he was assigned to serve as the CRM for three Account Managers.

23. Martin was one of the AMs Anderson was assigned to work with as a CRM.

24. Anderson was assigned to work in two regions and in two divisions.

25. Because regions and divisions were so large Anderson was unable to train with his division manager, which resulted in most of his training being performed by two AMs: Bert Martin and his wife, Mandy Martin.

26. Anderson had a good working relationship with Mandy Martin but a very contentious one with Bert Martin.

27. Anderson first worked with Bert Martin during a territory to ride to call on Alcon customers.

28. During that ride, Martin insisted on listening to a documentary about Robert E. Lee and described to Anderson how misunderstood Confederate soldiers and the Confederacy were. Anderson responded that he was more interested in discussing the job they needed to do together, rather than the 'misunderstood' Confederate soldiers.

29. Martin made racially inappropriate comments to Anderson on a number of occasions.

30. Martin was a fan of the movie "BlacKkKlansman." This film tells the story of Ron Stallworth, an African American detective on a mission to infiltrate and expose the local chapter of the Ku Klux Klan. Stallworth's primary form of infiltration was via telephone, using what the film considers a "Caucasian" voice to gather information. The film depicts Stallworth working his way up the organizational ladder and eventually becoming a confidant for the Klan, as the Klan members never knew he was African American.  Bert would frequently reference this movie or call Anderson "Stallworth" as he worked with surgeons/doctors.

31. Martin often made derogatory comments to Anderson, including but not limited to:

> "You got'em Stallworth they never know what they are working with until it is too late"
>
> " You do 'White' voice better than me"
>
> " You're not going to Stallworth my ass. I know what I am working with here."

32. One day when Anderson needed to drop lenses off at Martin's residence, he called Martin to let them know he was on his way to his house. Anderson asked that Martin notify his family's nanny so that she would not be startled when he arrived at the home. Martin's response was **"I'll let her and my neighbors know not to worry because you're one of the few good ones."**

33. On another occasion when Martin needed to get lenses from Anderson, they arranged to meet at the Department of Motor Vehicles in eastern Henrico County. Before the meet occurred, Martin texted Anderson that he was ill and could not stop and meet him. As a result, Anderson took the lenses to Martin's house and told Mrs. Martin that he hoped Mr. Martin felt better soon. She responded "**this is bullshit that he would make you do this**" and explained that when Bert Martin pulled into the parking lot where they were supposed to meet. , Bert told his wife that he saw a number of African-Americans in the area and refused to get out of his car because "**it wasn't a safe environment**" and " **I did want my car to get stolen by any hooligans**"

34. Communications with Martin were very distressing as he was frequently argumentative with Anderson. He constantly questioned what Anderson was doing and why. His ideas of what should be done appeared to be random and impulsive with no consistency or scheduling in his process. If Martin felt Anderson's answers were unsatisfactory, he would hang up on him in the middle of his response. This occurred multiple times each week.

35. Beginning in January 2019, Anderson voiced his concerns to his division manager, Kevin Clark. He continued to voice these concerns on multiple occasions including his mid-year and annual reviews on July 16, 2019 and November 13, 2019. Each time, Clark's response consisted of changes that Anderson needed to make to accommodate Bert, as Bert, was the veteran and a great producer. Clark simply stated, "this is the Alcon Way." Clark made it very clear that the Alcon culture honors production over everything and that so long as Martin was productive, the company would accept his bad behavior.

36. Anderson's conflict with Martin came to a head on December 12, 2019.

37. Anderson and Martin were having a business dinner with two doctors to discuss new and current products. The incident occurred at Zoe's Steaks and Seafood located at 713 19th St., Virginia Beach, VA.

38. The dinner lasted from approximately 7:15 p.m. until approximately 11:00 p.m. when the restaurant closed. As Anderson began to leave with the doctors, Martin insisted Anderson stay longer so that they could talk.

39. The owner of the restaurant was a long-time friend of Martin and said that Anderson and Martin could sit at the bar.

40. Martin was very abusive in describing his displeasure with Anderson. He continually attacked Anderson's integrity calling him a liar and stating that if he, Martin, doesn't know where Anderson is at all times then he, Anderson, must be doing nothing. He repeatedly questioned Anderson's work ethic stating that Anderson was not working hard enough or smart enough.

41. Throughout this discussion Martin was cursing profusely, getting in Anderson's face and pointing the finger at him. Martin further stated that the last CRM did not listen to him and he constantly had to clean up "his shit" and that was not happening again.

42. Some of the comments made by Martin at that time included the following:

"I like you, but this shit can't continue"

"I've been in this territory for 16 years and I know everything"

"You were chosen because my wife (Mandy Martin) chose you"

"It drives me fucking nuts when you're not in my territory because this is where your money is made."

43. Martin then took out his phone and showed Anderson a picture of his home with his car in the driveway. This greatly concerned Anderson as he had never given Martin his home address. Anderson asked Martin when the pictures were taken and why was he scoping out his house. Martin snatched the phone back and said "that's not important".

44. Martin went on to say, "you say you are working and this pic says otherwise. What am I supposed to believe?"

45. Soon after this event, because of the toxic and racially abusive work environment created by Martin, Anderson filed a complaint with the HR Department of Alcon requesting that Alcon take direct and appropriate actions to address Martin's aggressive and unstable behavior. Anderson stated he would not feel safe working with him until Martin received appropriate mental health and alcohol dependency evaluation. He further requested that Martin be required to receive anger management counseling.

46. Before sending the complaint to HR, Anderson discussed the issue with Dean Burns, a Vice President at Alcon. Burns is the highest-ranking African American employee at Alcon

with over 25 years' experience with the company. He encouraged Anderson to report the incidents to HR immediately stating, "If you don't report this I will, as a witness to this harassment."

47. Anderson was so concerned about Martin's behavior that he and his wife sought a protective order against Martin in the Chesapeake City court system.

48. Anderson was contacted by Ryan Garman ("Garman") of the Global Employee Relations department at Alcon.

49. Garman and Anderson had a phone conversation on December 18, 2019 and later spoke on three additional occasions. Each time Anderson explained his concerns and answered any questions that he was asked.

50. Anderson never received any written response to his complaint nor did anyone from HR initiate any conversation to discuss findings, next steps, or how to resolve the situation.

51. Alcon's only response to Anderson's complaints occurred during an unplanned and undocumented confrontation with William Doran, the president of Alcon.

52. On January 29, 2020 Doran texted Anderson at 11:15 p.m. requesting a "man to man" conversation. Anderson was not advised as to what the meeting would be about.

53. At the meeting Mr. Doran told Anderson that the company had made no decision regarding any disciplinary action towards Bert Martin other than give him a firm warning.

54. Doran made five points during this meeting that clearly demonstrated the Alcon's disregard for Anderson's concerns and the toxic and racially motivated behavior of Martin. These comments were:

    1)    Why didn't you simply say "Fuck you" to Martin's accusations?

   2)  Doran repeatedly related Martin's toxic and racially abusive comments and behavior to Martin's alcohol intake.

   3)  Doran asked why Anderson had filed for a protective order, not understanding the concerns Anderson had the safety of his family.

   4)  Doran asked about and was critical of Anderson filing a formal complaint to HR rather than calling his supervisor or him, Doran, before moving forward.

   5)  Doran asked multiple times whether Anderson had shared the story with anyone and implored Anderson not to tell anyone else about these incidents as to do so would be detrimental to Anderson's career as well as anyone he would discuss this with.

 55. Doran acknowledged that Martin's behavior was "wrong, unacceptable, and not a reflection of the Alcon culture" but that the company and HR had no plans to take disciplinary action regarding Martin's behavior in this case other than a warning.

 56. On February 5, 2020 Kevin Clark, a senior division manager with Alcon and the supervisor for Anderson and Martin, sent an email containing his expectations for the year.

 57.  In a follow-up conversation, Clark agreed that Anderson was following these expectations and that Martin was unwilling to follow them and was not doing so.

 58. Anderson reiterated that he was not comfortable working in an environment that regularly required him to interact with someone (Martin) who threatened him, his family, and his financial well-being.

 59. Anderson specifically voiced his concerns to Clark regarding Martin's past problems with other coworkers, specifically African American coworkers.

 60. Clark explained that he understood Anderson's frustration with Martin and was there to support Anderson but the decisions being made at this point were well above him.  Clark

agreed that Martin was inappropriate and challenging to work with, but the decisions were not his to make. Clark further stated that upper management, specifically President Doran, said they simply need to move forward.

61. Clark reiterated that Anderson must start communicating with Martin again in order to succeed at Alcon.

62. Anderson's complaint about Martin's abusive and racially motivated behavior towards an African American coworker is not the first Alcon has received.

63. Martin was previously the subject of another complaint of racial discrimination and name-calling by another African American coworker. On that occasion, as in this one, Martin was simply given a reprimand.

### Count I-Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964
**(HOSTILE WORK ENVIRONMENT)**

64. The allegations contained in the above paragraphs 1 through 63 are hereby incorporated by reference.

65. Alcon's conduct as alleged at length herein constitutes discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e. et seq.

66. Alcon's conduct as alleged herein created an unduly hostile work environment for Anderson.

67. Alcon's and Martin's conduct was unwelcome harassment based on Anderson's race.

68. Alcon's harassment of Anderson was pervasive and severe, creating an abusive working environment.

69. Alcon was aware of Martin's conduct and did not taken any of the necessary steps to rectify the behavior and/or remove him as close coworker to alleviate the hostile work environment.

70. Alcon's treatment of Anderson was with malice or reckless indifference to his federally protected rights.

71. As a proximate result of Alcon's and Martin's harassment and discrimination, Mr. Anderson was forced to work in a hostile work environment which caused him extreme embarrassment, pain and suffering, mental and emotional anguish, fear and distress.

72. As a further and proximate result of the said conduct as afore pled, Anderson quit a job that he loved and excelled at.

WHEREFORE, plaintiff Christopher Anderson respectfully requests that this Court enter an order awarding him the following:

a. the sum of Four Hundred and Fifty and 00/100 Dollars ($450,000.00) in compensatory damages suffered because of the discrimination and retaliation.

b. the sum of One Million and 00/100 Dollars ($1,000,000.00) in punitive damages as defendants' discriminatory practices were with malice or with reckless indifference to the federally protected rights of the plaintiff;

c. pre-judgment and post-judgment interest at the legal rate;

d. reasonable attorneys' fees and the costs in bringing and prosecuting these actions as well as the costs for experts;

e. damages for pain and suffering, mental anguish, and loss of enjoyment in life;

f. injunctive relief; and

g. all other relief as this Court deems appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts set forth herein.

Dated: February 10, 2021

                                              Respectfully Submitted,

                                              CHRISTOPHER ANDERSON

                                              BY: W. Joseph Owen III    /s/
                                                   W. Joseph Owen, III (VSB# 15963)
                                                   Samuel J. Kaufman   (VSB# 48442)
                                                   Attorneys for Plaintiff
                                                   Christopher Anderson
                                                 Owen & Owens PLC
                                                 15521 Midlothian Turnpike, Suite 300
                                                 Post Office Box 717
                                                 Midlothian, Virginia 23113
                                                 (804) 594-1911 Telephone
                                                 (804) 594-0455 Fax
                                                 jowen@owenowens.com
                                                 skaufman@owenowens.com